**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ANTHONY LOGAN,

                      Plaintiff,               1:18-cv-01179 (BKS/CFH)

v.

CHIEF ERIC S. CLIFFORD, ASSISTANT CHIEF
PATRICK LEGUIRE, ASSISTANT CHIEF JACK
FALVO, LT. ERIK GANDROW, SGT. JEFFREY
MCCUTCHEON, SGT. THOMAS HARRIGAN, DET.
SGT. PETER FORTH,

                      Defendants.

**Appearances:**

*For Plaintiff:*
Leo Glickman
Stoll, Glickman & Bellina, LLP
5030 Broadway, Suite 652
New York, New York 10034

*For Defendants:*
Gregg T. Johnson
Corey A. Ruggiero
Johnson & Laws, LLC
646 Plank Road, Suite 205
Clifton Park, New York 12065

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

    This action arises from a June 5, 2017 incident during which Plaintiff Anthony Logan

was shot twice by officers of the Schenectady Police Department ("SPD") at his home in

Schenectady, New York. (Dkt. No. 2, ¶¶ 9–49).[1] In the Complaint, Plaintiff alleges that SPD Chief of Police Eric Clifford, Assistant Chief of Police Patrick Leguire, Assistant Chief of Police Jack Falvo, Lieutenant Erik Gandrow, Sergeant Jeffrey McCutcheon, Sergeant Thomas Harrigan, and Detective Sergeant Peter Forth ("Defendants") were deliberately indifferent to his serious medical need in violation of the Fourteenth Amendment under 42 U.S.C. § 1983. (*id.* ¶¶ 57–62). Plaintiff also brings state law claims for negligence, (*id.* ¶¶ 51–56), and intentional infliction of emotional distress, (*id.* ¶¶ 63–67). Defendants move for summary judgment under Federal Rule of Civil Procedure 56 as to all of Plaintiff's claims. (Dkt. No. 38). Plaintiff opposes the motion. (Dkt. Nos. 41–43). For the reasons that follow, Defendants' motion is granted.

## II.   FACTS[2]

### A.   "Domestic" Call – 535 Mumford Street #2

At 9:50 a.m. on June 5, 2017, SPD received a "third party call for a domestic where a male was reportedly choking a female"[3] at 535 Mumford Street #2 in Schenectady; police were dispatched at 9:52 a.m. (Dkt. No. 38-11, at 2; Dkt. No. 38-2, ¶ 26; Dkt. No. 42, ¶ 26; Dkt. No. 43-1, at 1). SPD Officer Jonathan Haigh, who, along with Officer Smith,[4] were two of the first officers to respond to the call, spoke with the caller, who was at the scene and told them that "his granddaughter . . . told him that Anthony was" inside the residence "choking her mother." (Dkt.

---

[1] On October 1, 2018, Defendants removed this action from the Supreme Court of the State of New York, Schenectady County.

[2] The facts are drawn from Defendants' Statement of Material Facts, (Dkt No. 38-20), and Plaintiff's response to that statement, (Dkt. No. 42), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The relevant facts are largely undisputed, (Dkt. Nos. 38-20, 42, 44-2); the Court has identified those facts in dispute. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[3] The evidence in the record suggests that the male subject of this call was Plaintiff Anthony Logan and the female subject was Plaintiff's wife, Joanna Logan. (Dkt. No. 38-20, ¶ 25; Dkt. No. 42, ¶ 25 (citing Dkt. No. 38-4, at 62 (Plaintiff testifying that he was found "not guilty" for the domestic charges filed against him)).

[4] Officer Smith's first name is not reflected in the record; neither Officer Haigh nor Smith is a defendant in this case.

No. 43-1, at 1; Dkt. No. 38-10, at 2 (Police Call History indicates "caller is at the location – advised to wait outside for PD" at 9:54 a.m.). The residence located at 535 Mumford Street is a two-story house with front porches on both the first and second floors. (Dkt. No. 40 (CD with video of 535 Mumford Street)). Plaintiff lived in the apartment on the second floor. (Dkt. No. 38-20, ¶¶ 26, 39; Dkt. No. 42, ¶¶ 26, 39). The porch on the second floor is covered by a ceiling and a high-pitched roof, has a half wall on three sides, and has a door that leads into the second floor. (Dkt. No. 40 (CD with video of 535 Mumford Street)).

Officers Haigh and Smith knocked on the second-floor apartment door but received no response. (Dkt. No. 43-1, at 1). Officers Haigh and Smith had been to the residence before and were able to recall Plaintiff's name and that he lived in the residence. (*Id.*). They asked "dispatch to run Anthony Logan"; dispatch informed them that Plaintiff "was on Parole for possession of a weapon." (*Id.*). The Officers returned to the residence "to attempt to make contact," "knocking on the door and . . . announcing" SPD. (*Id.* at 2). While in the "stairwell to the second floor," Officer Haigh received a transmission from a third officer who had arrived at the scene that "he had just observed a male peek his head out of a window on the north side of the building." (*Id.*). Officers Smith and Haigh ran to the north side of the building where the third officer told them he "just observed a male throwing a bag out of the window into an open window of the vacant building." (*Id.*; Dkt. No. 38-10, at 2 (Police Call History notes "tossed something from the window" at 10:13 a.m.)). As other officers arrived at the scene, Officer Haigh briefed them and directed them to "maintain a perimeter around the house." (Dkt. No. 43-1, at 2). Officer Haigh provided "the details about the bag being thrown into the window" to two of the newly-arrived officers, who then "went to look for the bag." (*Id.*). Officer Haigh received a radio transmission

from one of the officers who went to look for the bag that "a 1033 long [gun] had just been recovered." (*Id.*; Dkt. No. 38-10, at 2 (Police Call History notes "10-33 Long" at 10:15 a.m.)).

SPD Sergeant Jeffrey McCutcheon arrived at 535 Mumford Street at approximately 10:15 a.m. and was "debriefed by officers on the scene," who informed him that Plaintiff had thrown, and police had recovered, a bag containing a rifle and ammunition out of the second-floor apartment. (Dkt. No. 38-16, ¶ 6). "Within a minute" of his arrival, Sgt. McCutcheon "used a megaphone to try and communicate with Plaintiff, and others in the house, repeatedly telling them to come out of the apartment." (*Id.* ¶ 7; Dkt. No. 38-20, ¶ 33; Dkt. No. 42, ¶ 33). At first, no one responded, but approximately ten minutes after he arrived, Sgt. McCutcheon saw "a woman in a white towel quickly peer through" the door leading to the second-floor porch, and then "vanish." (Dkt. No. 38-7, at 17–18). Sgt. McCutcheon again commanded anyone in the apartment to exit, "and eventually [Plaintiff] appeared" on the second-floor porch. (*Id.* at 19; Dkt. No. 38-16, ¶ 7). Sgt. McCutcheon told Plaintiff to "come downstairs," but Plaintiff repeatedly refused, at one point responding: "I ain't coming downstairs." (Dkt. No. 38-7, at 20; Dkt. No. 38-20, ¶¶ 35–36; Dkt. No. 42, ¶¶ 35–36). "Moments later, Plaintiff reached over the half wall of his porch with his cell phone in his hand and pointed it down at the SPD officers below his porch in a shooting action yelling 'buck, buck, buck' which prompted the officers on the ground to seek cover." (Dkt. No. 38-16, ¶ 7). Sgt. McCutcheon stated that he and the other officers present believed they saw Plaintiff "waving around" a gun. (Dkt. No. 38-7, at 43). At that point, Sgt. McCutcheon "called the SPD headquarters and requested that the SPD Special Operations Squad ('SOS') respond to the scene since it was clear to [him] that Plaintiff was non-compliant, dangerous and creating a hostage or barricade situation." (Dkt. No. 38-16, ¶ 7). The fire department, which was two blocks from 535 Mumford Street, had also been called and

informed that there was "stand-off," and had a paramedic and a doctor from Albany Medical in a vehicle, ready and waiting for further instructions. (Dkt. No. 38-7, at 58–59).

From the ground, Sgt. McCutcheon continued to talk to Plaintiff on the second-floor porch. (*Id.* at 23–24). Plaintiff asked why police were there and Sgt. McCutcheon told Plaintiff that they were "there investigating a domestic incident and that he needed to come down . . . before things got worse." (*Id.*). Plaintiff responded that "he would need ten minutes," which Sgt. McCutcheon said was not acceptable; Plaintiff then said "he needed two minutes," to which Sgt. McCutcheon responded that "he needed to come down immediately." (*Id.* at 24). Plaintiff said he would and "went back inside the house." (*Id.*).[5] Sgt. McCutcheon "yell[ed] for [Plaintiff] to come outside, come downstairs." (*Id.* at 20).

At approximately 10:26 a.m., Plaintiff's wife, Johanna Logan, "came running out of the back of the residence obviously distraught and upset." (*Id.* at 24; Dkt. No. 38-16, ¶ 8; Dkt. No. 38-10, at 3). Sgt. McCutcheon stated that Ms. Logan was "crying" and "reached out," grabbed [him] by the arm," and held onto him while he took her down the street to talk to her. (Dkt. No. 38-7, at 25, 27). Sgt. McCutcheon handed Ms. Logan over to detectives after approximately five minutes and returned to 535 Mumford Street. (*Id.* at 27–28).

**B.     The Shooting**

Upon returning to the scene, Sgt. McCutcheon saw Plaintiff on the second-floor porch and "heard officers yelling 'Show me your hands.'" (*Id.* at 28). Plaintiff walked "over to one side of the porch where" two officers were and was "looking over the porch to see where other officers were." (*Id.*). Officer Haigh stated that Plaintiff was "at the edge of the porch" and

---

[5] While Plaintiff was on the porch, Officer Haigh "observed the female stick her head out of a window on the north side of the building" and she "was pleading for us to help." (Dkt. No. 43-1, at 2).

"motioning with his hands downward as if he was pointing at something" and "said, 'I have a gun right here.'" (Dkt. No. 43-1, at 2–3). Officer Haigh told Plaintiff "not to play any games and to show me his hands" and Plaintiff then "repeated himself that he had a gun" while "looking downward as if he had something that was in front of him." (*Id.* at 3). Plaintiff "then very quickly reached down and came up over the top of the porch pointing a greyish green colored object towards" one of the officers. (*Id.*). According to Sgt. McCutcheon, the officers were "yelling 'show me your hands'" when Plaintiff "dipped his body in a posture that was below the rim of the front . . . porch where you could not see his hands and he abruptly made a motion that appeared that he was pointing a gun and shooting at the [two] officers that were closest to him." (Dkt. No. 38-7, at 29; *see also id.* at 75 (Robert Outlar, an onlooker, testified at Plaintiff's criminal trial that after an exchange of words with the police, Plaintiff "reached down under the balcony and then he came up over the balcony" and that "[it] looked like he was holding a gun")). "At that point shots were fired"; it was 10:37 a.m. (*Id.* at 29; Dkt. No. 38-10, at 3). Nine shots were fired; Plaintiff was struck twice and had "two wounds"—one in the pelvic area and one in the upper shoulder area. (Dkt. No. 38-7, at 61, 98). Sgt. McCutcheon "saw [Plaintiff] drop below the rim of the porch . . . where [Sgt. McCutcheon] could no longer see him." (*Id.* at 29–30). SPD Officer Daniel McDonald, who was at the scene and "fired one shot," heard Plaintiff say "I've been hit." (Dkt. No. 43-4, at 1–2). All seven Defendants state, in some form, in their declarations that at no point prior to police entry into Plaintiff's apartment two hours later, did they know of the nature or extent of Plaintiff's injuries or hear Plaintiff request medical attention. (*See* Dkt. No. 38-13, ¶¶ 12, 15 (Clifford stating: "At no point did I have a visual of Plaintiff, nor did I personally observe the nature, extent, or location of Plaintiff's injuries" and that he never heard Plaintiff request medical attention); Dkt. No. 38-14, ¶ 15 (Gandrow); Dkt. No. 38-15, ¶¶

6

14, 16 (Falvo); Dkt. No. 38-16, ¶¶ 16–17 (McCutcheon); Dkt. No. 38-17, ¶¶ 18–19 (Forth); Dkt.

No. 38-18, ¶¶ 16–17 (Harrigan); Dkt. No. 38-19, ¶¶ 10 (Leguire)).

    **C.**    **Post-Shooting Events**

    Sgt. McCutcheon "immediately announced that shots had been fired and called for

paramedics to respond to the scene, not knowing who, if anybody, had been injured by the

gunfire." (Dkt. No. 38-16, ¶ 9; *see also* Dkt. No. 38-10, at 3 (Police Call History noting "Stage

Medics" at 10:37 a.m.)). Between 10:37 a.m. and 11:01 a.m., Sgt. McCutcheon "communicated

with all SPD officers at the scene to ensure no SPD officers had been shot and all SPD officers

were accounted for." (Dkt. No. 38-16, ¶ 10). After ensuring all officers on the scene had

acknowledged they were "okay," Sgt. McCutcheon "called for more officers to assist at the

scene" as "[p]eople [were] coming out on their porches, large crowds gathering at the north and

south ends of the street" and were in "close proximity" to the scene. (Dkt. No. 38-7, at 30–31).

    Lieutenant Brian Heaney of the local fire department testified that in response to a call

that came into the fire station at approximately 10:37 a.m., (*id.* at 64–65), they moved to "the

corner of Mumford," where they "met up with Mohawk Ambulance," and "had a briefing about

what [they] would do"; they were "worried that someone was shot" and they "planned for the

worst-case scenario of what was needed," (*id.* at 59). The paramedics were "staged at the outer

perimeter of the scene," (Dkt. No. 38-16, ¶ 11), "until the scene was secured"—a determination

made by the police department, (Dkt. No. 38-7, at 59–60).

    Plaintiff stated that immediately after he was shot, he could see SPD officers on other

balconies across the street and in the adjacent balcony next door. (*Id.* at 47–48). Plaintiff stated

that these officers could see him. (*Id.* at 36). Plaintiff testified that after he was shot, Sgt.

McCutcheon instructed him to "put your hand up if you got a gun"; Plaintiff did not have a gun

and did not put his hand up. (Dkt. No. 38-4, at 31). Sgt. McCutcheon then instructed Plaintiff to

"put your hand up if you don't got a gun"; Plaintiff testified that he put his hand up. (*Id.*).

Plaintiff testified that Sgt. McCutcheon also asked if he could get up or move and that he tried to

respond and said that he could not get up, but that he did not know whether Sgt. McCutcheon

could hear him. (*Id.* at 40). Plaintiff testified that he "really couldn't talk" because anytime he

tried to speak, his chest would bleed. (*Id.* at 45). Plaintiff made no other attempts to

communicate as he "really couldn't do much." (*Id.* at 46). Plaintiff did, however, call his mother

to tell her that he loved her and that he had been shot. (*Id.* at 44). After Plaintiff "made that call

[he] threw the phone off of the porch." (*Id.*). Plaintiff testified that he "threw a couple things off

of the porch," at the point when Sgt. McCutcheon was asking if he could get up, explaining that

"me throwing stuff off the porch was basically me telling him I can't get up." (*Id.* at 52). Sgt.

McCutcheon saw Plaintiff "throw objects off the front porch onto the street" after he was shot.

(Dkt. No. 38-7, at 32; Dkt. No. 43-1, at 3 (Officer Haigh observed Plaintiff throwing "black cell

phone, pink wiffle ball bat and other objects").

Between 10:00 a.m. and 10:30 a.m., SPD Detective Sergeant Peter Forth and SPD

Sergeant Thomas Harrigan, both of whom were members of the SPD's Special Operations Squad

("SOS"), (Dkt. No. 38-17, ¶¶ 5–6; Dkt. No. 38-18, ¶ 5), received "an alert through the SPD's

'Rapid Notify System,' and traveled to the SPD," where they were among the first four "SOS

members to physically arrive," (Dkt. No. 38-17, ¶ 9; Dkt. No. 38-18, ¶ 7). By the time Sergeants

Forth and Harrigan left "SPD headquarters in an SPD vehicle with . . . other SOS members,"

they had been "debriefed" that (1) "a male suspect . . . had barricaded himself in a second-floor

apartment after a potential violent domestic incident and his wife was heard pleading for help

from inside the second-floor apartment," (2) that "Plaintiff had a violent history involving

weapons charges and that at least one firearm had been recovered near the scene where Plaintiff

had barricaded himself,"[6] and (3) that "Plaintiff had made shooting threats and/or gestures directed at SPD officers on the scene." (Dkt. No. 38-17, ¶ 9; Dkt. No. 38-18, ¶ 7). Sergeants Forth and Harrigan arrived at the incident scene between 11:20 a.m. and 11:30 a.m., (Dkt. No. 38-18, ¶ 9; *see also* Dkt. No. 38-20, at 5 (Police Call History noting "SOS enroute [sic] to house" at 11:18 a.m.)), where they were "advised that shots had been fired, that Plaintiff had threatened to shoot officers, and that Plaintiff had verbally stated that he had a gun," (Dkt. No. 38-17, ¶ 10; Dkt. No. 38-18, ¶ 8).

Sgt. Forth testified that they staged "a safe distance from the house," and waited for "other members of the [SOS] team to show up." (Dkt. No. 38-7, at 85). After replacing "some of the perimeter officers with [SOS] team officers to get a better view," bringing in snipers, who were positioned to "look into the house," and placing SOS team members "on the roof of the church . . . directly across the street," they "started to develop [a] plan for how [they] were actually going to go into the house." (*Id.* at 87). Sgt. Forth explained that the SOS team then started the "game plan," by meeting with the chiefs and receiving briefing "as to what the situation was." (*Id.* at 86). Sgt. Forth, SPD Commissioner Wayne Bennett, Assistant Chief Patrick Leguire, Lieutenant Erik Gandrow, and Sgt. Harrigan agreed "that we needed to plan and conduct our operations with the assumption that Plaintiff was armed and dangerous until we had reliable information that indicated otherwise." (Dkt. No. 38-17, ¶ 25; Dkt. No. 38-18, ¶ 21).

Although it is undisputed that police could see Plaintiff, (Dkt. No. 38-4, at 36, 47 (Plaintiff testifying that there were officers on balconies "across the street and next door" and that they "could see" him)), efforts to obtain a complete visual of Plaintiff on the second-floor

---

[6] There is evidence in the record that police at the scene knew Plaintiff was on "Parole for possession of a weapon." (Dkt. No. 43-1, at 1). However, the record does not reflect what officers knew about a "violent history."

porch were unsuccessful. Sgt. Forth "climbed up on a nearby rooftop to observe the second-floor porch where Plaintiff barricade [sic] himself," but "could not see Plaintiff to evaluate his condition and the level of threat he presented" and was "unable to observe the entire second-floor porch." (Dkt. No. 38-17, ¶ 14). Sgt. Forth noted that some SPD team members "took positions on nearby rooftops, or other elevated locations, in an effort to obtain a visual of the porch," and that they "reported that they could see movement on the porch and some blood," but "did not report that they could see the entire porch area to confirm the absence of weapons or see the extent of any injuries suffered by Plaintiff." (*Id.* ¶ 26). Sgt. Harrigan explained that "[w]hile [he] had a report that Plaintiff was seen with blood on his shirt, that did not mean that Plaintiff was no longer dangerous or armed with weapons." (Dkt. No. 38-18, ¶ 12). Sgt. Harrigan heard "numerous radio transmissions by and between SPD officers who were posted at elevated locations around the incident scene, but none of those transmissions indicated that any SPD Officer had a clear visual of Plaintiff, Plaintiff's injuries, or the entire porch area where Plaintiff barricaded himself." (*Id.* ¶ 18).

At that time, "the SPD did not own or control any helicopters, drone devices, robotic equipment, or other specialized equipment" that would have enabled officers "to obtain a clear visual of the second-floor porch at 535 Mumford Street." (Dkt. No. 38-17, ¶ 26). Seeking "alternative means . . . to gain a more accurate assessment of the dangers which Plaintiff presented as [they] developed a clear plan of entry," Sergeants Harrigan and Forth, and the SOS team, contacted, and "[w]ithin a matter of minutes" confirmed, that "the Albany Police Department's SWAT Team could make their robotics team available." (Dkt. No. 38-18, ¶ 23). Because the Albany "team needed to be called into service, assembled, [and] equipped" and then

needed to travel to the scene, it was "60-90 minutes" before the robotics team arrived at the incident scene. (*Id.*).

Prior to the Albany team's arrival, the SPD's SOS team "started getting a layout of . . . the house," and "put SWAT team members on the perimeter . . . to put eyes on the actual house as opposed to the patrol people that were there." (Dkt. No. 38-7, at 86). They determined the layout of the house by debriefing Plaintiff's wife, talking to "other officers that had been to that house before," and looking at the exterior of the house and assessing the location and size of windows and the location of vent pipes and doors. (*Id.*).

Once the Albany SWAT team members arrived, the SOS team "debriefed them on the situation and showed them the drawing [they] had created of the second-floor apartment layout based upon the information [they] had acquired from Plaintiff's wife." (Dkt. No. 38-18, ¶ 23). The "game plan was to approach the house, [and] enter through the back of the house." (Dkt. No. 38-7, at 88). The SPD used "a battering ram" to knock down the back door on the second level. (*Id.* at 89–90). Sgt. Forth, who had the robot, and two "team leaders [with] shields,"[7] went through the back door and Sgt. Forth "threw the robot into the apartment." (*Id.* at 89–90). Sgt. Forth testified that the robot made it "from the back of the apartment to the front room of the apartment," where it encountered a couch that was "almost barricading the door" and prevented the robot from moving forward. (*Id.* at 89). The Albany SWAT team then "brought a smaller robot" that was "a little bit bigger than a baseball" and "roles [sic] around." (*Id.* at 90). The robot was able to clear the apartment and gave the SPD SOS team "a visual on the suspect in the front of the house." (*Id.* at 91). Sgt. Forth testified that Plaintiff "was laying on his back on the front

---

[7] Lt. Gandrow explained that while "the SOS[] had ballistic shields at the scene, those shields were not designed to stop high powered rifle rounds like the rifle recovered from Plaintiff was capable of firing" and that it was therefore "critically important for the SOS[] team to obtain as much information about Plaintiff's condition and access to weapons before any entry plan was executed and any arrest was made." (Dkt. No. 38-14, ¶ 21).

porch," where "[t]here was a lot of garbage," and other items. (*Id.* at 92–93). Sgt. Harrigan stated

that "[w]hile the video images did inform us that no large weapons or large quantities of

ammunition were present on the porch," they "could not confirm that Plaintiff had no weapons

(e.g. small firearm located under his body)." (Dkt. No. 38-18, ¶ 23). The images also showed that

"Plaintiff was no longer actively aggressive as he was lying on the porch floor." (Dkt. No. 38-17,

¶ 27). The robot "stayed with the camera on [Plaintiff]" while the team "physically cleared from

the back to the front of the house." (Dkt. No. 38-7, at 91).

Based on this information, SOS "within a matter of minutes" "executed [their] entry plan

using various distraction techniques (e.g. flash bang) as team members entered Plaintiff's

apartment rear door and made their way to the front porch where they placed Plaintiff in

handcuffs." (Dkt. No. 38-18, ¶ 23; Dkt. No. 38-17, ¶ 27). Plaintiff stated that when the SWAT

team entered, they "flipped [him] over, cuffed [him] behind [his] back" "basically dragged [him]

inside" the apartment by his shoulders or armpits, where they put him on a stretcher. (Dkt. No.

38-4, at 55). Sgt Forth testified that once Plaintiff was "secured" and "handcuffed," they "told

the paramedics that they could come upstairs." (Dkt. No. 38-7, at 93).

Upon learning the scene was secured, the paramedics, doctor, and Mohawk crew "got in

the ambulance," "arrived at the front of the house[,] . . . entered the building, went up to the

second floor, grabbed the individual that was laying on the floor, put him in a . . . stretcher," [8]

and brought him to the ambulance where they "started treating" him. (Dkt. No. 38-7, at 60; Dkt.

No. 38-4, at 58 (Plaintiff testifying that he "started receiving medical attention" once he was in

the ambulance)). Plaintiff was breathing, alert, and talking; he had "two wounds"—one in the

---

[8] Plaintiff recalls being placed on a stretcher on the second floor but stated that police personnel, not paramedics, placed him on the stretcher and carried him downstairs. (Dkt. No. 39-4, at 55).

pelvic area and one in the upper shoulder area. (Dkt. No. 38-7, at 61). The paramedics assessed

Plaintiff, "did bleeding control on his wounds, checked his blood pressure, put him on a monitor,

put him on oxygen, [and] gave him fluids." (*Id.* at 63). They transported Plaintiff to Albany

Medical Center, where a medical team was waiting. (*Id.* at 64).

    **D.**    **Videos**

    Plaintiff submitted two short videos. (Dkt. No. 40). The first is approximately 25 seconds

long and appears to have been recorded by an individual across the street and begins several

second before the shooting. Plaintiff, who is wearing a white t-shirt, is standing in the corner of

the second-floor porch with his body angled toward the police officers standing below that

corner of the porch; Plaintiff's upper body is bent forward slightly, his arms are straight, but

down and slightly in front of him, and his hands, which are below the porch railing, are not

visible. (Dkt. No. 40, 00:03). While maintaining that position, Plaintiff bends his right arm at the

elbow, and then straightens it, moving his hand below the porch railing. (*Id.* 00:03–05). Plaintiff

then quickly raises his right arm while leaning forward; Plaintiff's right arm is straight, and he

appears to be pointing it toward the police directly below. (*Id.* 00:08–09). Police immediately

fire their weapons at Plaintiff, who falls backward onto the porch. (*Id.* 00:09–10).

    The second video also appears to have been recorded from across the street and shows

Plaintiff apparently sitting up on the porch—only his head is visible—and then shows Plaintiff

pulling himself up to a standing position, leaning on the porch.[9] (*Id.* 00:32–54). Plaintiff's white

t-shirt is covered in blood and he rests both forearms on the porch railing. (*Id.* 00:59). Multiple

---

[9] The second video does not indicate the time, but the Police Call History notes "male was hanging on the porch railing" at 12:45 p.m. (Dkt. No. 38-10, at 6).

voices can be heard on the video yelling for help on Plaintiff's behalf. (*Id.* 00:59–1:02 (voices yelling "help him" and "somebody help him before he falls off")).

### E.     Remaining Defendants

The following is a summary of the evidence regarding the alleged involvement by Defendants Clifford, Leguire, Gandrow, and Falvo.

#### 1.     SPD Chief of Police Eric Clifford

Chief Clifford initially monitored "SPD officers' response to a domestic violence incident at 535 Mumford Street via radio and . . . mobile phone" and monitored "the situation more closely" once he heard reports "that Plaintiff's conduct . . . was escalating into a potential hostage and/or barricade situation." (Dkt. No. 38-13, ¶¶ 3, 7). From 11:40 a.m. to 12:30 p.m., after learning that shots had been fired, Chief Clifford communicated with detectives, assistant chiefs, supervisors of the SOS, and the supervisor of the "paramedic's squad that had been summoned to the scene immediately after shots were fired." (*Id.* ¶ 8). Chief Clifford then went to the scene, where he observed SPD officers "trying to confirm" the safety of all SPD officers, the threat level Plaintiff posed, the layout of Plaintiff's second-floor apartment, "the best way to safely manage the crowd that responded to gunfire[,] and the safest way to bring the barricade situation to an end." (*Id.*). Chief Clifford "did become aware that the paramedics Supervisor expressed concern about his medics approaching or entering the residence at 535 Mumford Street until the scene was secure, Plaintiff was in police custody, and the nature of his injuries [was] confirmed." (*Id.* ¶ 17). Chief Clifford responded "by encouraging the Supervisors to dispatch the paramedics to be staged at a perimeter location near the incident scene." (*Id.*).

#### 2.     SPD Assistant Chief of Police Patrick Leguire

In addition to being Assistant Chief, Leguire was the Administrative Commander of the SPD's SOS team. (Dkt. No. 38-19, ¶ 5). "At approximately 10:10 A.M. on the morning of June

5, 2017," Assistant Chief Leguire "was alerted that SPD officers responded to a radio call regarding a domestic violence incident at 535 Mumford Street." (*Id.* ¶ 6). "As the reports from the scene came in," Assistant Chief Leguire "learned that SPD Officers at the scene had recovered a bag containing a rifle and ammunition which Plaintiff had thrown out of the second-floor apartment at 535 Mumford Street." (*Id.*). At approximately 11:00 a.m., "a call for the SOS[] came in," and Assistant Chief Leguire "authorized deployment of the SOS[] using the SPD's Rapid Notify System and . . . began to drive to the scene." (*Id.* ¶ 8). When Assistant Chief Leguire "arrived at the scene shortly after 11:00 A.M., the immediate action SOS team was already developing a plan of action and coordinating with the Albany PD SWAT team to use robots to conduct surveillance of the interior spaces of Plaintiff's apartment and his front porch." (*Id.*). "When [Leguire] arrived at the incident scene to observe the execution of the entry plan developed by SOS/SOT team members, Sergeant Forth and Sergeant Harrigan," he had been informed that "shots had been fired and [that] Plaintiff reported that he had a gun." (*Id.* ¶ 14). Assistant Chief Leguire explained that "[d]espite the measures taken by the SOS/SOT to develop information to prepare an entry plan (i.e. placing spotters on rooftops and/or other elevated locations and enlisting the Albany PD SWAT robotics team) [he] believed there [were] significant risks to SOS team members making entry into Plaintiff's second-floor apartment." (*Id.*). "Due to these significant risks, [Leguire] fully supported the plan to wait for the robots so an assessment of the risks and dangers in Plaintiff's apartment and on his porch could be evaluated before SPD officers made entry into Plaintiff's apartment." (*Id.*).

### 3.     SPD Lieutenant Erik Gandrow

Lieutenant Gandrow was the Operations Commander of the SPD's SOS team. (Dkt. No. 38-18, ¶¶ 3–4). Shortly before 12:00 p.m., Lt. Gandrow learned about the "barricade situation" at 535 Mumford Street and that the SOS team members had been assembled "and were finalizing

their entry plan under the direction of Sergeants Forth and Harrigan." (*Id.* ¶ 9). SOS team members informed Lt. Gandrow that Plaintiff had stated that he had a gun; "one rifle had already been removed at the scene; and shots had been fired" and that "Plaintiff had a violent history involving weapons charges." (*Id.* ¶ 9). Lt. Gandrow arrived at the incident scene "between 12:00 P.M. and 12:40 P.M.," where he learned that "Sergeants Forth and Harrigan had already developed an entry plan and were waiting for the Albany Police Department . . . SWAT team to prepare and deploy their robots so the SOS could obtain a visual of the treats [sic] which Plaintiff posed and the risks of making a forced entry." (*Id.* ¶ 10). "Within minutes" of Lt. Gandrow's arrival at the incident scene, the Albany PD SWAT team members deployed their first robot into Plaintiff's second-floor apartment." (*Id.*). Lt. Gandrow "observed the live video feeds from the two robots deployed into Plaintiff's apartment" from a secure location at the scene. (*Id.* ¶ 11). Lt. Gandrow did not see Plaintiff or "receive[] any information about his injuries, if any, until [he] saw paramedics transporting him from 535 Mumford Street into an ambulance at approximately" 1:00 p.m. (*Id.* ¶ 15).

### 4.    SPD Assistant Chief of Police Jack Falvo

Assistant Chief Falvo initially monitored the situation at 535 Mumford Street from SPD headquarters, but at approximately 12:00 p.m., he traveled to the scene to provide support. (Dkt. No. 38-15, ¶ 8). Assistant Chief Falvo observed Plaintiff twice at the scene: once when Plaintiff "momentarily rose up from behind the wall surrounding the second-floor porch where he had barricaded himself," and again "after Plaintiff had been taken into custody," when Plaintiff was placed in the ambulance. (*Id.* ¶¶ 11–13). Assistant Chief Falvo made no "operational decisions since Commissioner Bennett had assumed command control and the SOS Supervisors were developing and updating their plan of action." (*Id.* ¶ 8).

### III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir.2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome

a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)

(quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere

conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact

where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting

*Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.     DISCUSSION

### A.      Section 1983 Claim

Defendants move for summary judgment dismissing Plaintiff's deliberate indifference

claim "based upon the alleged delay in access to medical attention" on the grounds that it is

"legally infirm and factually baseless" and they are entitled to qualified immunity. (Dkt. No. 38-

2, at 14–20, 22–29). Plaintiff opposes Defendants' motion, arguing that he has "supported his

14th Amendment claim for deliberate indifference to his serious medical needs." (Dkt. No. 41, at

4–8).

#### 1.      Fourteenth Amendment - Deliberate Indifference[10]

An arrestee's[11] claim for "deliberate indifference to [a] serious threat to health or safety,"

such as exposure to unconstitutional conditions of confinement or the failure to treat a serious

---

[10] Plaintiff has not challenged the reasonableness of the use of force or the seizure, claims that would invoke the Fourth Amendment. *See Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

[11] Defendants argue that that Fourteenth Amendment "obligation to provide Plaintiff access to medical care did not attach until Plaintiff was in police custody." (Dkt. No. 38-2, at 17). They further assert that Plaintiff was not in "police custody until (approximately 12:55 P.M.) moments before paramedics and a doctor arrived to attend to him," and they had no obligation "to furnish medical care" to Plaintiff until he was in police custody. (*Id.* at 18). In suggesting they had no constitutional obligation to provide medical care during the time period between the shooting and police entry onto the second-floor porch, Defendants overlook two fundamental principles of constitutional law. First, "there can be no question that apprehension by the use of deadly force is a seizure" under the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Second, the "Due Process clause [requires] the responsible government or governmental

medical need, *Darnell v. Pineiro*, 849 F.3d 17, 33 n.9 (2d Cir. 2017), is "governed by the Due Process Clause of the Fourteenth Amendment." *Id.* at 29; *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that the Due Process Clause of the Fourteenth Amendment requires a "government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police"); *see also, e.g.*, *Mills v. Fenger*, 216 F. App'x 7, 10–11 (2d Cir. 2006) (evaluating the plaintiff's claims that the defendant arresting officers denied medical treatment after injuring his leg during the arrest under the deliberate indifference standard of the Fourteenth Amendment); *Weyant v. Okst*, 101 F.3d 845, 856–57 (2d Cir. 1996) (analyzing a pre-arraignment arrestee's denial of medical treatment claim under the Fourteenth Amendment standard); *see also, e.g.*, *Shakir v. Stankye*, 805 F. App'x 35, 40 (2d Cir. 2020) ("[W]e have treated even pre-arraignment conditions of confinement claims as arising under the Fourteenth Amendment.").

Following the Second Circuit's decision in *Darnell*, an arrestee alleging deliberate indifference to serious medical needs under the Fourteenth Amendment must establish: (1) that the alleged deprivation of medical care is "sufficiently serious"; and (2) that the defendant either: "acted intentionally to impose the alleged condition" or "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." 849 F.3d at 30, 35 (emphasis added); *see Walker v. Wright*, No. 17-cv-425, 2018 WL 2225009, at *5, 2018 U.S. Dist. LEXIS 81408, at *12 (D. Conn. May 15, 2018) (noting that, while *Darnell*'s holding was applied to a conditions of confinement claim,

---

agency to provide medical care to persons . . . who have been injured while being apprehended by the police." *City of Revere*, 463 U.S. at 244.

"[d]istrict courts in this Circuit have . . . applied *Darnell*'s objective '*mens rea*' prong to claims of deliberate indifference to serious medical needs under the Fourteenth Amendment").

### 2. Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1089 (2d Cir. 2021) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009)).

### 3. Analysis

That Plaintiff's injuries and the alleged delay in providing medical care meet the "sufficiently serious" threshold for a deliberate indifference claim is undisputed. (Dkt. No. 38-2, at 15 ("For the purposes of the instant motion, Defendants do not dispute the seriousness of Plaintiff's injuries.")). Accordingly, the Court must consider whether, in delaying medical care, Defendants acted with deliberate indifference. "[D]eliberate indifference, in the context of a Fourteenth Amendment due process claim, can be shown by something akin to recklessness, and does not require proof of a malicious or callous state of mind." *Charles v. Orange Cty.*, 925 F.3d 73, 86 (2d Cir. 2019). It "can be established by either a subjective or objective standard: A plaintiff can prove deliberate indifference by showing that the defendant official 'recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition

posed an excessive risk to [the plaintiff's] health or safety.'" *Id.* at 87 (emphasis in original) (quoting *Darnell*, 849 F.3d at 35). Further, a "plaintiff must show 'something more than mere negligence' to establish deliberate indifference in the Fourteenth Amendment context." *Id.* (quoting *Weyant*, 101 F.3d at 856). Conduct "may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Id.* (quoting *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000)).

The evidence in the record shows that all Defendants were aware that shots had been fired. (Dkt. No. 38-13, ¶ 8 (Clifford); Dkt. No. 38-14, ¶ 9 (Gandrow); Dkt. No. 38-15, ¶ 7 (Falvo); Dkt. No. 38-16, ¶ 9 (McCutcheon); Dkt. No. 38-17, ¶ 10 (Forth); Dkt. No. 38-18, ¶ 8 (Harrigan); Dkt. No. 38-19, ¶ 14 (Leguire)). And although Defendants maintain they were not "aware of the nature (or seriousness) of Plaintiff's injuries until *after* Plaintiff was taken into custody," (Dkt. No. 38-13, ¶ 12 (emphasis added) (Clifford); *see also* Dkt. No. 38-14, ¶ 15 (Gandrow); Dkt. No. 38-15, ¶¶ 14, 16 (Falvo); Dkt. No. 38-16, ¶¶ 16–17 (McCutcheon); Dkt. No. 38-17, ¶¶ 18–19 (Forth); Dkt. No. 38-18, ¶¶ 16–17 (Harrigan); Dkt. No. 38-19, ¶ 10 (Leguire)), given the video, which shows police shooting and Plaintiff instantly falling back and below the second-floor porch railing, out of view, (Dkt. No. 4, at 00:09–10), and a report that "Plaintiff was seen with blood on his shirt," (Dkt. No. 38-18, ¶ 12),[12] a reasonable factfinder could easily conclude that Defendants "knew, *or should have known*," that Plaintiff had been shot and that a delay "posed an excessive risk to [the plaintiff's] health or safety." *Charles*, 925 F.3d at 87 (quoting *Darnell*, 849 F.3d at 35); *see Spavone v. N.Y.S. Dep't of Corr. Servs.*, 719

---

[12] There is evidence that all Defendants were monitoring reports from the scene or were at the scene. (Dkt. No. 38-13, ¶¶ 7–8 (Clifford); Dkt. No. 38-14, ¶ 9 (Gandrow); Dkt. No. 38-15, ¶¶ 7–8 (Falvo); Dkt. No. 38-16, ¶ 20 (McCutcheon); Dkt. No. 38-17, ¶ 26 (Forth); Dkt. No. 38-18, ¶ 12 (Harrigan); Dkt. No. 38-19, ¶¶ 14, 24 (Leguire)).

F.3d 127, 138 (2d Cir. 2013) ("[A]wareness may be proven 'from the very fact that the risk was obvious.'" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). The Court therefore next considers whether in delaying medical care for over two hours to ensure it was safe for officers and paramedics to enter the second-floor apartment, Defendants acted "intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to" Plaintiff. *Darnell*, 849 F.3d at 35.

Here, even viewing the facts in the light most favorable to Plaintiff, there is no evidence from which a factfinder could conclude that any Defendant acted with culpable recklessness; the undisputed evidence shows that the entirety of the delay was attributable to the process of ensuring police and paramedics could enter the second-floor apartment safely.

First, to the extent Plaintiff contends the SPD's security concerns were unfounded, he has failed to adduce evidence showing a material issue of fact on this point. In addition to the fact that Plaintiff had reportedly choked his wife and failed to comply with orders to leave his apartment, police were aware that Plaintiff was on parole for possession of a weapon, (Dkt. No. 43-1, at 1), had thrown one gun off the porch, (Dkt. No. 38-16, ¶ 6), and announced "I have a gun right here," (Dkt. No. 43-1, at 3), immediately before raising his arm up, pointing toward police, (Dkt. No. 40, at 00:08–09), with an object in his hand that looked like a gun, (Dkt. No. 38-7, at 75). Thus, the SPD reasonably believed Plaintiff was armed and intended to harm police.

Second, the evidence shows that the SPD acted quickly at each step in the effort to ensure police and paramedics could enter the apartment safely. The SPD contacted paramedics within the same minute that shots were fired. (Dkt. No. 38-10, at 3 (Police Call History noting "shots fired" at 10:37:21 and "stage medics" at 10:37:42)). Paramedics arrived within minutes and were ready to act once the SPD advised the scene was secure. (Dkt. No. 38-7, at 59–60, 64–65).

Members of the SPD took positions on nearby rooftops and balconies but reported that they could not obtain a full visual of Plaintiff's condition, or of the porch to ensure no weapons were present. (Dkt. No. 38-17, ¶¶ 14, 26; Dkt. No. 38-4, at 26, 47; *see also* Dkt. No. 38-18, ¶¶ 12, 18 (Sgt. Harrigan stating that while he had received "a report that Plaintiff was seen with blood on his shirt, that did not mean that Plaintiff was no longer dangerous or armed with weapons")). The SPD did not have "helicopters, drone devices, robotic equipment, or other specialized equipment" that would have enabled officers "to obtain a clear visual of the second-floor porch, (Dkt. No. 38-17, ¶ 26), but was able, "within a matter of minutes," to confirm the availability of the Albany Police Department's robotics team. (Dkt. No. 38-18, ¶ 23). It took 60 to 90 minutes for the Albany Police Department's robotics team to assemble, travel to Schenectady, and set up. (*Id.*). By the time the robotics team arrived, the SPD, including Sergeants Forth and Harrigan, were prepared with a drawing of the second-floor apartment's layout and entry plan. (*Id.*). The SOS team began making entry at 12:38 p.m., (Dkt. No. 38-10, at 6), and deployed robots to obtain a full visual of Plaintiff and the porch, confirming that there were "no large weapons or large quantities of ammunition" and that Plaintiff "was no longer acting aggressive as he was lying on the porch floor." (Dkt. No. 38-17, ¶ 27). By Plaintiff's own account, immediately after police entered his apartment, they handcuffed him, moved him to the living room, placed him on a stretcher, and took him downstairs to the waiting ambulance where medical treatment began at approximately 12:55 p.m. (Dkt. No. 38-4, at 55, 58, 60; Dkt. No. 38-10, at 6). Thus, Plaintiff has presented no evidence that Defendants failed "to act with reasonable care to mitigate the risk" the delay in medical treatment posed while securing entry to Plaintiff's apartment. *Darnell*, 849 F.3d at 35; *see Dollard v. City of New York*, 408 F. Supp. 3d 231, 237 (E.D.N.Y. 2019) (finding the plaintiff failed to show "that Defendants recklessly failed to act with reasonable care to

mitigate" the risk of delaying medical care, where the evidence showed that the defendants
"acted quickly" and immediately called for an ambulance upon observing the plaintiff in
distress).

Finally, Plaintiff identifies nothing in the record that would allow a factfinder to conclude
that Defendants intentionally or recklessly delayed medical care to Plaintiff, or that they delayed
medical care to punish Plaintiff—or for any reason other than to ensure that Plaintiff was not
"armed and dangerous" before the officers and paramedics entered the apartment, (Dkt. No. 38-
17, ¶ 25). *Cf. Cumberbatch v. Port Auth. of New York & New Jersey*, No. 03-cv-749, 2006 WL
3543670, at *9, 2006 U.S. Dist. LEXIS 88853, at *29 (S.D.N.Y. Dec. 5, 2006) (finding "genuine
issues of material fact . . . as to whether the Officers intentionally delayed or hindered medical
treatment to [the plaintiffs] for no other reason than to punish them or to make them suffer,"
where there was evidence that one of the plaintiffs "was handcuffed to a bench" following his
arrest and made "continued requests for medical attention" but was told by an officer that "they
wanted him to 'marinate'"); *see also, e.g.*, *Ali v. City of Louisville*, 395 F. Supp. 2d 527, 538–39
(W.D. Ky. 2005) (finding no deliberate indifference to medical needs where SWAT team was
called to get the plaintiff "out of his car" and "SWAT team, instead of EMS personnel, removed
[the plaintiff] from his car because the police were unsure if [the plaintiff] still posed a threat"
and the plaintiff "was in a car with a weapon and could have harmed EMS personnel trying to
give him medical treatment"); *see Kelsey v. City of New York*, No. 03-cv-5978, 2006 WL
3725543, at *8 n.8, 2006 U.S. Dist. LEXIS 91977, at *25 n.8 (E.D.N.Y. Dec. 18, 2006) ("[T]he
Court finds that the decision made by Officer Fink in the heat of the moment out of his concern
for officer safety cannot rise to the level of culpability required for a finding of deliberate
indifference, as a matter of law."), *aff'd*, 306 F. App'x 700 (2d Cir. 2009); *Long v. City & Cty. of*

*Honolulu*, 378 F. Supp. 2d 1241, 1248 (D. Haw. 2005) (finding no due process violation for

failing to aid the plaintiff after he was shot because there was "insufficient evidence" that the

defendant "delay[ed] medical attention, or somehow allow[ed the plaintiff] to 'bleed to death'"

where the "evidence indicates clearly that police did not know the particulars of the threat after

[the plaintiff] was shot," explaining that "[f]rom the police's perspective, [the plaintiff] could

have been only injured and still armed and capable of 'shooting some cops' as he said he would"

and  that it "was prudent for police to wait for the national guard vehicle to enter the premises"),

*aff'd*, 511 F.3d 901 (9th Cir. 2007). Accordingly, Defendants are entitled to summary judgment

as a matter of law dismissing Plaintiff's Fourteenth Amendment deliberate indifference claim.[13]

Even assuming that by delaying medical care to Plaintiff, Defendants were deliberately

indifferent to his serious medical needs, it was objectively reasonable for Defendants to believe

that their conduct in ensuring the safe entry of officers and paramedics before providing medical

care to Plaintiff did not violate the law. Defendants, therefore, would be entitled to qualified

immunity.

### B.    State Law Claims

Having dismissed Plaintiff's § 1983 deliberate indifference claim, the Court declines, in

its discretion, to retain supplemental jurisdiction over Plaintiff's state-law claims. *See* 28 U.S.C.

§ 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual

case in which all federal-law claims are eliminated before trial, the balance of factors to be

considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise

jurisdiction over the remaining state-law claims."). With the dismissal of the federal claims prior

---

[13] Finding no triable issues of fact with respect to the substance of Plaintiff's deliberate indifference claim, the Court need not address Defendants' arguments regarding personal involvement or collateral estoppel. (Dkt. No. 38-2, at 18–22).

to the investment of significant judicial resources, the "traditional 'values of judicial economy, convenience, fairness and comity'" weigh in favor of declining to exercise supplemental jurisdiction. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350). Accordingly, Plaintiff's state law claims are dismissed.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 38) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Fourteenth Amendment claim is dismissed with prejudice; and it is further

**ORDERED** that Plaintiff's state law claims are dismissed without prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 27, 2021
Syracuse, New York

Brenda K. Sannes
U.S. District Judge